**Law Offices of Donald Yannella, P.C.**
Member of NY & NJ Bars
Tel: (212) 226-2883
Fax: (646) 430-8379
Email: nynjcrimlawyer@gmail.com

70 Grand Avenue, Suite 100            233 Broadway, Suite 2370
River Edge, NJ  07661                 New York, NY  10279
                                      (Preferred mailing address)

October 28, 2016

Hon. John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

    Re:    United States v. Unique Newell
             15 Cr 386 (JGK)

Dear Judge Koeltl:

    I am counsel for Unique Newell, whose sentencing is scheduled for December 9, 2016. Mr. Newell pleaded guilty to conspiracy to distribute narcotics, in violation of 21 U.S.C. 846, 841(b)(1)(B), and he respectfully requests a sentence of 60 months' imprisonment.

    Mr. Newell also requests permission to file under seal portions of this brief dealing with physical and mental health.

I.

**History and Personal Characteristics**

    Although Mr. Newell was only twenty two years old at the time of his federal presentment, he had already experienced a lifetime's worth of hardship. He was raised in poverty in Queens and Brooklyn, New York, and both of his parents served prison time during his adolescence or teenage years. His mother served a four year sentence for a drug offense in the State of New York, and his father served 210 months for a federal offense in the District of Maryland. While his mother was in state prison, Mr. Newell travelled on a bus with his grandparents to visit her in an upstate prison, but he almost completely lost contact with his father.

    Mr. Newell was the oldest of his siblings, and he recalls that food was scarce. They moved repeatedly while his father was in prison because his mother kept on falling behind with

rent payments. When his mother went to state prison, Mr. Newell was sent to live with his maternal grandmother. However, the Administration for Children's Services ("ACS") placed Mr. Newell in foster care after someone reported that his maternal grandmother was using drugs.

ACS arranged for Mr. Newell's paternal grandmother to take custody of Mr. Newell and his siblings, removing him from foster care on a provisional basis. His paternal grandmother provided a better environment that what he had experienced at his maternal grandmother's home and in foster care. Although his paternal grandmother disciplined him with belts, she was more compassionate. Mr. Newell believes that that being disciplined with a belt made his behavior worse.

A primary reason for Mr. Newell's misbehavior was that he had posttraumatic stress disorder after witnessing his uncle's murder. That murder occurred in 1997, when Mr. Newell was six years old. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (p. 1)
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.. (p. 3)
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓… (p. 4)
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓.. (p. 5)
- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.. (p. 7)
- ▓▓▓▓▓▓▓▓▓▓▓▓… (p. 12)

(See Interfaith Records, attached as Exhibit A).

As a teenager, Mr. Newell attended Automotive High School and Clara Barton High School in Brooklyn. He was an average student but stopped attending school in the eleventh grade as a result of being arrested for robbery. According to Mr. Newell, he and his friend were fighting another young man, and Mr. Newell's friend stole the phone at the end of the fight. Mr. Newell pleaded guilty to robbery and was sentenced to 9 months.. On Rikers Island, he says he was forced to fight other inmates and placed in Segregated Housing. Mr. Newell earned his graduate equivalency degree on Rikers Island and was released after six months due to good behavior.

For eighteen months after his release from Rikers Island, Mr. Newell did almost nothing except party and socialize with women. He no longer attended school and was unemployed. Eventually he started going to Vermont, leading to a drug arrest near Burlington, Vermont in 2012 and his involvement in the instant case.

## II.

### The Nature and Circumstances of the Offense

The conspiracy involved bringing crack and heroin from the Lower East Side of Manhattan and from the Bronx to Bennington, Vermont. The drugs were distributed from apartments or hotel rooms in Bennington, Vermont, and firearms were in plain view in those locations.

Mr. Newell did not distribute drugs with his codefendants who obtained drugs on the Lower East Side. He has never been to the Lower East Side and has never met those codefendants. However, Mr. Newell admits that he brought drugs from New York to Bennington, Vermont. He would ride a $4 bus to upstate New York and then cross the border into Bennington, where he would stay at a cheap hotel for a couple of days. Mr. Newell never explored Bennington or did anything but party and distribute drugs there. He would only stay in Vermont for two or three days at a time.

When he could not afford a hotel, Mr. Newell stayed with a woman in Vermont who became a confidential informant. She and her boyfriend surreptitiously photographed Mr. Newell at her house. In the photograph, Mr. Newell is leaning over a mirror with white powder and a straw. The discovery also includes Mr. Newell's text messages setting up a drug transaction and video of Mr. Newell delivering drugs to another person in a parking lot.

## III.

### The Plea Agreement, Sentencing Guidelines, and Presentence Report

The plea agreement, which binds the parties but not the Court, stipulates that:

- The base offense level is 24 because the offense involved at least 28 but less than 112 grams of crack, pursuant to §2D1.1(b)(1);

- For possession of a firearm, two levels are added pursuant to §2D1.1(b)(1);

- Three levels are subtracted for timely acceptance of responsibility, pursuant to §3E1.1(a)

and (b);

- With six criminal history points, Mr. Newell is Criminal History Category III;

- The recommended sentence for Offense Level 23 in Criminal History Category III is 57 to 71 months' imprisonment;

- Because of the statutory minimum term of imprisonment for a violation of § 841(b)(1)(B), the Stipulated Range becomes 60 to 71 months' imprisonment.

The PSR puts Mr. Newell in Criminal History Category IV because it assesses eight criminal history points instead of six. The plea agreement did not account for a sealed case that the Probation Department uncovered with its more thorough criminal history check. Mr. Newell was arrested for that case on December 17, 2008, just after his 16th birthday. He was adjudicated a Youthful Offender in April 2009. A year later, his probation was revoked because of the robbery conviction discussed above, and Mr. Newell was resentenced to six months' imprisonment for the petit larceny to run concurrent with the robbery sentence. Because that is a prior sentence of more than 60 days' imprisonment, two additional criminal history points are assessed. (¶ 43 of PSR).

Mr. Newell has three objections to the PSR. His mother has documentation that he has his GED (¶ 69); he denies even having been a gang member (¶51); and he entered Clara Barton High School in 2006, not in 2003 (¶ 69).

## IV.

### Just punishment, deterrence, rehabilitation, and the need to provide educational and vocational training, and medical treatment in the most effective manner

Mr. Newell has been in custody since his arrest at his grandmother's house on June 24, 2015. A term of 60 months' imprisonment would be sufficient to punish Mr. Newell and serve as individual and general deterrence.

Mr. Newell needs drug treatment. As set forth in the PSR, he used marijuana on a daily basis from the age of 14 until his federal arrest, and he sniffed heroin two or three times per year between the ages of 19 and 22. (PSR ¶ 65, 67).

Although there is no basis to dispute that two points are assessed for the petit larceny sentence, Mr. Newell maintains that Criminal History III more accurately reflects the seriousness of his criminal history and the likelihood that he would reoffend. The United States Supreme Court recognizes that there are limits to the punishment that should be imposed on young

offenders. *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (our standards of decency do not permit the execution of any offender under the age of 16 at the time of the crime). Elevating Mr. Newell from Criminal History Category III to IV for an offense he committed just after turning 16 is fundamentally unfair.

In 2010, the Sentencing Commission amended the Guidelines to direct courts to consider youth as a possible basis for a downward departure. See U.S.S.G. 5H1.1. Under the plea agreement, Mr. Newell is permitted to argue that he is in Criminal History Category III, but he is not permitted to seek a horizontal departure. Therefore, we ask that the Court consider the Sentencing Commission's new policy regarding age as a sentencing factor under § 3553(a) in deciding the appropriate sentence.

There are three major reasons that offenses committed at a young age may merit less punishment. First, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill considered actions and decisions." *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). Second, "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Third, the character of a youth is not as well formed as that of an adult. "The personality traits of juveniles are more transitory, less fixed." *Roper v. Simmons*, 543 U.S. 551, 570, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

In 18 U.S.C. § 3553(a), Congress mandated that federal sentences be "sufficient, but not greater than necessary" to achieve the sentencing objectives set forth in § 3553(a)(2), namely the traditional goals of retribution, deterrence, incapacitation, and rehabilitation. That statutory provision, which is often called the parsimony clause, is overarching and should take precedence over any provision of the merely advisory Guidelines.

A Guidelines sentence would be ineffective for deterring others. If the purpose of a Guidelines sentence is to deter others, history shows that such a message will not reach its intended audience.

It would be error to presume that the advisory Guidelines range is reasonable. *See Gall v. United States*, 552 US 38, 50, 128 S.Ct. 586 (2007); *United States v. Broxmeyer*, 699 F.3d 265, 290 (2d Cir. 2012) (the district court "cannot assume that a Guidelines sentence is warranted in a particular case but, rather, must make an independent sentencing determination,"); *United States v. Cavera*, 550 F.2d 180, 188 (2d Cir. 2008) (the court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant."). The Guidelines are only the "starting point and the initial benchmark." *Gall*, 552 U.S. at 49.

## Conclusion

Mr. Newell accepts responsibility for distributing narcotics and requests that he be sentenced to a term of five years' imprisonment. He is indigent and cannot afford to pay a fine.

Mr. Newell requests recommendations to the Bureau of Prisons that he be (1) admitted to the Residential Drug Abuse Treatment Program; (2) designated to a facility close to New York City to facilitate visitation by family and friends; (3) admitted to the Residential Drug Abuse Program ("RDAP").

Sincerely,

/s/

Donald J. Yannella, Esq.

# EXHIBIT A --- REDACTED